# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING (1) THE USE OF A PEN REGISTER DEVICE AND TRAP AND TRACE DEVICE AND (2) THE ACQUISITION OF CELL-SITE INFORMATION FOR TELEPHONE NUMBER (417) 371-6965. | No. 17-pr-2015 DPR<br><br>(UNDER SEAL) |

## APPLICATION

Timothy A. Garrison, Assistant United States Attorney, Western District of Missouri, (hereinafter "Applicant") hereby applies to the Court pursuant to 18 U.S.C. §§ 2703, 3122, and 3123 for an order authorizing the installation and use of a pen register and a trap and trace device (hereinafter "Pen/Trap") on a cellular telephone bearing number (417) 371-6965 (hereinafter the "Target Telephone") and authorizing disclosure of subscriber information, including the location of cellular towers (cell-site and sector/face) related to the use of the Target Telephone (hereinafter "cell-site information"). In support of this application, I state the following:

1. Applicant is an "attorney for the Government," as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure, and therefore, pursuant to 18 U.S.C. §§ 2703(d) and 3122, may apply for an order authorizing the installation and use of a Pen/Trap and acquisition of cell-site information.

2. By this application, the Government seeks an order authorizing the installation and use of a Pen/Trap on the Target Telephone and the acquisition of

subscriber information and cell-site information related to the use of the Target Telephone. The requested information does not include GPS data, tower triangulation records, or E-911 Phase II location information.

### (A) <u>PEN/TRAP</u>

3. Pursuant to 18 U.S.C. § 3123(a)(1), upon an application made under 18 U.S.C. § 3122(a)(1) a court "shall enter an ex parte order authorizing the installation and use of a Pen/Trap anywhere within the United States, if the court finds that the attorney for the Government has certified to the court the information likely to be obtained by such installation and use is relevant to an ongoing investigation."

4. Installation and use of a pen register will record or decode dialing, routing, addressing, or signaling information transmitted from the Target Telephone. The information transmitted from the Target Telephone will include information about dialing, routing, addressing, or signaling information for "push-to-talk" communications if the cellular device is push-to-talk capable, and will include dialing, routing, addressing, or signaling information for text messaging communications if the cellular device is text messaging capable. The information will also include records regarding the date, time, and duration of calls created by such incoming impulses for a period of 60 days.

5. Installation and use of a trap and trace device on the Target Telephone will capture and record the incoming electronic or other impulses that identify the originating numbers or other dialing, routing, addressing, or signaling information reasonably likely to identify the sources of wire or electronic communications. The information transmitted from the Target Telephone will include dialing, routing, addressing, or signaling information for "push-to-talk" communications if the cellular device is push-to-

2

talk capable and will include dialing, routing, addressing, or signaling information for text messaging communications if the cellular device is text messaging capable. The information will also include records regarding the date, time, and duration of calls created by such incoming impulses, for a period of 60 days.

### (B) SUBSCRIBER AND CELL-SITE INFORMATION

6. Pursuant to 18 U.S.C. § 2703(d), a court may order an electronic communication service provider to disclose non-content information about a customer or subscriber if the Government "offers specific and articulable facts showing that there are reasonable grounds to believe that the ... records or other information sought[] are relevant and material to an ongoing criminal investigation."

7. Cellular telephone companies routinely create and maintain, in the regular course of their business, records of information concerning their customers' usage. These records typically include for each communication a customer makes or receives (1) the date and time of the communication, (2) the telephone numbers involved, (3) the cell tower to which the customer connected at the beginning of the communication, (4) the cell tower to which the customer was connected at the end of the communication, and (5) the duration of the communication. The records may also, but do not always, specify a particular sector of a cell tower used to transmit a communication.[1] Cell-site information is useful to law enforcement because of the limited information it provides about the

---

[1] Cell towers are often divided into three 120-degree sectors, with separate antennas for each of the three sectors. To the extent this information does exist in a particular instance, it does not provide precise information regarding the location of the cell phone at the time of the communication, but instead shows only in which of the three 120-degree, pie-shaped sectors the phone was probably located.

3

general location of a cell phone when a communication is made. As one court has explained:

> The information does not provide a "virtual map" of the user's location. The information does not pinpoint a user's location within a building. Instead, it only identifies a nearby cell tower and, for some carriers, a 120-degree face of that tower. These towers can be up to 10 or more miles apart in rural areas and may be up to a half-mile or more apart even in urban areas.

*In re Application of United States for an order for Disclosure of Telecommunications Records,* 405 F. Supp. 2d 435, 449 (S.D.N.Y. 2005) (citation omitted).

8. Applicant certifies the Drug Enforcement Administration (DEA) is conducting a criminal investigation of William JONES and others as yet unknown, in connection with possible violations of 21 U.S.C. §§ 841(a)(1), 843(b), and 846. It is believed one or more of the subjects of the investigation are using the Target Telephone, a cellular phone issued by Verizon to Tracfone Wireless, Inc., and used by JONES in furtherance of the subject offenses.

### (C) SPECIFIC ARTICULABLE FACTS

9. In support of the request for an order under 18 U.S.C. § 2703(d) directing the furnishing of subscriber and cell-site information, and based upon discussions with Special Assistant United States Attorney Josephine Larison and the investigation of DEA Task Force Officer (TFO) Jason R. Carter, Applicant sets forth the following specific and articulable facts showing there are reasonable grounds to believe the Pen/Trap and cell-site information sought is relevant and material to an ongoing criminal investigation:

    a. On August 11, 2017, United States District Judge M. Douglas Harpool signed a court order authorizing the interception of communications to

4

and from (417) 496-0575 (hereinafter JONES Telephone 1), a cellular phone used by JONES. Interception of the communications to and from that phone began on August 14, 2017.

b. On August 15, 2017, at 6:00 p.m., an outgoing call was placed on JONES Telephone 1 to an unknown male at telephone number (816) 582-6007. An administrative subpoena of that number identified it as a T-Mobile cellular phone registered to Arthur BARRETT at 17417 South Benton Drive, Belton, Missouri. A Facebook search of JONES' publicly accessible Facebook page showed he was "friends" with a profile bearing the name, "Art Barrett." While looking through that profile, TFO Carter found it had multiple "friends" in common with JONES' profile.

c. TFO Carter listened to the conversation, where JONES and BARRETT talked about "the Mexicans" being ready for JONES. Based on his knowledge, training, and experience, TFO Carter knows Mexico is a source country for numerous kinds of illegal narcotics. BARRETT also referred to something that JONES was going to get as "big birds." TFO Carter also believe the "big birds" BARRETT referred to was a coded phrase for a large quantity of drugs. Based on their conversation, it was evident BARRETT was involved in helping supply JONES with narcotics, and JONES had a shipment awaiting him. It was also evident BARRETT was happy with the quality of the drugs by saying, "it's real pretty man," and that JONES would be getting the "same stuff."

d. BARRETT then told JONES to "get at me when you're ready homie." Based on the fact that BARRETT told JONES he would let "old boy"

5

know JONES would be ready in a couple of days, and that BARRETT instructed JONES to call him when he was ready, it appears BARRETT acts as an intermediary between JONES and his source of supply.

e. JONES also mentioned during the call that he would be obtaining a second phone from which he would call BARRETT. Based on TFO Carter's knowledge, training, and experience, he knows that drug dealers often use "burner" phones—pre-paid cellular phones—for a short period of time before replacing them in an effort to avoid detection by law enforcement. This practice is often referred to a "dropping" a phone.

f. On August 20, 2017, the wire monitors found JONES had stopped answering incoming calls and had ceased any outgoing communication on JONES Telephone 1. TFO Carter contacted the Sprint Corporation about the cause of this, and their staff informed him that the phone had been powered off on the evening of August 20, 2017.

g. From the administrative subpoena TFO Carter initially submitted for JONES Telephone 1 in October 2016, he knew that the phone number had been active since May 2014. He also knew JONES had used that phone for at least the past 11 months, as he had been monitoring calls made to it from the Missouri Department of Corrections (MDOC) since that time, and had heard JONES' voice during those phone calls. Based on the length of time that phone had been active, and the above-listed information regarding JONES' known use of multiple telephones at one time, TFO Carter expected JONES Telephone 1 would likely

6

become active again, but in the meantime, he believes JONES was using a different phone.

    h.    On August 16, 2017, this Court signed an order authorizing the tracking of the GPS location of a phone using number (417) 493-8242 and known to be used by Allen CASSIDY.

    i.    On August 24, 2017, TFO Carter used the aforementioned court-authorized GPS data for CASSIDY's phone to locate him in Billings, Missouri. DEA TFOs Keith Mills, Richard Leslie, and Carter established surveillance and waited for CASSIDY to leave the location where they had located him. At approximately 10:40 a.m., CASSIDY got into the driver's seat of a blue 2006 Pontiac Grand Prix. TFO Carter checked the license plate on the Pontiac driven by CASSIDY and found it had been reported as a stolen vehicle. Agents followed the vehicle as it traveled toward the city of Springfield, Missouri.

    j.    Greene County, Missouri, Sheriff's Office (GCSO) Deputy Morgan Rudderham attempted a traffic stop of the Pontiac after it entered Springfield, but CASSIDY refused to yield, and Deputy Rudderham initiated a vehicle pursuit. CASSIDY was not apprehended at that time.

    k.    TFO Carter knew CASSIDY resided at 2916 West Chestnut Street, Springfield, Missouri. TFO Carter relayed that information to deputies, who responded to that area in an attempt to intercept CASSIDY. While waiting for him to arrive, GCSO Deputy Scott Harrison observed a silver colored 2004 Chrysler Pacifica driving in the area. He observed the vehicle was displaying two different license plates. Deputy Harrison checked the license plates and learned

that one of the plates had been reported stolen. The male driver was arrested and identified as Kyle EVANS. EVANS was arrested for numerous active felony warrants, and was booked into the Greene County, Missouri, Jail.

l. TFO Carter continued to monitor the GPS location data provided for CASSIDY's phone and determined that he was at JONES' home.

m. Due to the likelihood that CASSIDY contacted JONES by phone after fleeing police and before arriving at his residence, TFO Carter reviewed the toll data for CASSIDY's phone during the timeframe of the incident described above. TFO Carter found CASSIDY had been in contact with the Target Telephone on August 24, 2017, at 1:02 p.m.

n. A Facebook search of the Target Telephone revealed it was associated with a Facebook profile of "William Jones." There were no photos displayed on the profile, but it shared multiple "friends" found on JONES' other known Facebook profile. Based on the name of the profile and the common friends list, TFO Carter believes that Facebook page was a secondary page used by JONES.

o. An administrative subpoena revealed that the Target Telephone is a Verizon Wireless Corporation prepaid cellular phone registered to Tracfone Wireless, Inc., that was established on August 22, 2017. While reviewing the phone tolls of the Target Telephone, TFO Carter found they are very similar to the tolls of JONES Telephone 1.

p. Because of his belief that JONES was using the Target Telephone, TFO Carter requested copies of prison calls made from any MDOC inmate phone

accounts to the Target Telephone's number. The Intelligence Unit Manager for MDOC provided TFO Carter with recordings of phone calls made to the Target Telephone.

  q. One of the calls to the Target Telephone provided to TFO Carter occurred on August 24, 2017, at 1:32 p.m., which was during the timeframe CASSIDY had fled from police. That call was made to the Target Telephone from the MDOC inmate phone account of Shawn Doolin. The conversation was short, but TFO Carter immediately recognized JONES' voice as he told Doolin, "They got Kyle," clearly referring to the above-described arrest of EVANS. JONES also told Doolin he needed to keep the line open because he was on the way to "pick up another bro that's on foot." TFO Carter believes JONES was referring to CASSIDY.

10. In accordance with 18 U.S.C. § 3121(c), Applicant has informed the DEA it shall use technology reasonably available to it to restrict the recording or decoding of electronic or other impulses to the dialing, routing, addressing, and signaling information used in the processing and transmitting of wire or electronic communications so as not to include the contents of any wire or electronic communication.

11. Based upon the above facts, and pursuant to 18 U.S.C. §§ 2703(c) and (d), and 3127, because there are reasonable grounds to believe such information is relevant and material to an ongoing criminal investigation, Applicant requests the Verizon Wireless Corporation, and any other person or entity providing wire or electronic communications service in the United States whose assistance may facilitate the execution of the order, be ordered to supply the following subscriber information: (1)

name; (2) address; (3) the billing names and addresses (if different); and (4) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address of a subscriber, for published, non-published, or unlisted dialing, routing, addressing, or signaling information captured by the pen register on the Target Telephone, and for published, non-published, or unlisted dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication transmitted to the Target Telephone as captured by the trap and trace device on the Target Telephone, upon oral or written demand by agents of the DEA.

12. Based upon the above facts, and pursuant to 18 U.S.C. § 2703(c) and (d) and § 3127, because there are reasonable grounds to believe such information is relevant and material to an ongoing criminal investigation, Applicant requests the Verizon Wireless Corporation, and any other person or entity providing wire or electronic communications service in the United States, whose assistance may facilitate the execution of the order, be ordered to supply the cell-site information for the Target Telephone, at call inception and call termination, including the physical address of the cellular tower, upon oral or written request of agents of the DEA. This request should specifically preclude the Verizon Wireless Corporation from initiating any signals to the Target Telephone to determine the cell-site location for the Target Telephone and limit the information to cell-site information kept in the ordinary course of retaining subscriber information.

13. Because the assistance of the Verizon Wireless Corporation will be necessary to accomplish the objectives of the requested order, Applicant further requests the order direct that upon service of the order upon it, the Verizon Wireless Corporation

furnish information, facilities, and technical assistance necessary to accomplish the installation of the Pen/Trap, including installation and operation of the devices unobtrusively and with a minimum of disruption of normal service. The Verizon Wireless Corporation shall be compensated by DEA for reasonable expenses incurred in providing such facilities and assistance in furtherance of the order.

14. It is further requested this authorization for the installation and use of a pen register device and trap and trace device apply not only to the telephone number listed above for the Target Telephone, but also to any changed telephone number(s) subsequently assigned to an instrument bearing the same cellular device as the Target Telephone, or any changed cellular device subsequently assigned to the same telephone number as the Target Telephone, or any additional changed telephone number(s) or cellular device(s), whether the changes occur consecutively or simultaneously, listed to the same subscriber and wireless telephone account number as the Target Telephone within the period authorized by this order.

15. Applicant further requests the Court direct the local, long distance, and wireless carriers listed in the order, and any other person or entity providing wire or electronic communication service in the United States whose assistance is used to facilitate the execution of the order, to notify special agents of the DEA, upon oral or written request, of any and all changes (including additions, deletions, and transfers) in service regarding the Target Telephone, to include telephone numbers and subscriber information (published and non-published) associated with these service changes.

16. Applicant further requests the Target Telephone remain active and in service, and if the Target Telephone has been targeted for deactivation due to non-

11

payment or breach of contract, the DEA will incur the future billing costs at the point of deactivation and compensate the wireless carrier for such additional billing costs beginning from the date of deactivation and continuing through the time authorized by this order.

17. Applicant further requests, pursuant to 18 U.S.C. § 3123(d), that the Court direct the local, long distance, and wireless carriers listed in the proposed order, and any other local, long distance, or wireless carrier is obligated by the order to provide assistance to the DEA not to disclose in any manner, directly or indirectly, by any action or inaction, to the listed subscriber(s) for the Target Telephone, the subscriber of the incoming calls to or outgoing calls from the Target Telephone, or to any other person, the existence of the Application, the resulting court order, in full or redacted form, or the investigation for any reason, except as required to execute the order, unless or until ordered by this Court.

WHEREFORE, IT IS REQUESTED that this Court enter an ex parte order for a period of 60 days, commencing upon the date of installation of the Pen/Trap, authorizing the installation and use of a Pen/Trap to collect the dialing, routing, addressing, and signaling information (including date and time) associated with communications to or from the Target Telephone.

IT IS FURTHER REQUESTED that the order authorize agents of the DEA to acquire, during the same 60-day period, subscriber information for the numbers captured by the pen register and trap and trace.

IT IS FURTHER REQUESTED that the order authorize agents of the DEA to acquire, during the same 60-day period, cell-site information for communications to and

from the Target Telephone as well as the physical location of cellular tower(s) identified nearby.

IT IS FURTHER REQUESTED that the order direct the Verizon Wireless Corporation to furnish the DEA forthwith all information, facilities and technical assistance necessary to effectuate the order unobtrusively and with minimum interference to the services presently accorded the user of the Target Telephone.

IT IS FURTHER REQUESTED that this Application and the anticipated order of this Court be filed under seal, and the Court direct the Verizon Wireless Corporation not to disclose to any person the existence of this Application, the resulting order, or the investigation for any reason, except as required to execute the order, unless or until ordered otherwise by this Court.

I declare the foregoing is true and correct to the best of my belief and knowledge.

TIMOTHY A. GARRISON
Assistant United States Attorney
The Hammons Tower
901 St. Louis Street, Suite 500
Springfield, Missouri 65806
(417) 831-4406

Sworn to before me and subscribed in my presence at Springfield, Missouri, this 14th day of September, 2017.

DAVID P. RUSH
United States Magistrate Judge
Western District of Missouri